Alexander Del Giorno, J.
This is a claim to recover damages for personal injuries sustained by the infant claimant as the result of an alleged assault and battery committed upon him by a supervisor of the State Agricultural and Industrial School at Industry, New York. The father and guardian ad litem of the infant seeks to recover damages for medical expenses and for loss of services.
In September, 1956, claimant, then 14 years of age, was confined to the State Agricultural and Industrial School at Industry, New York, where he was assigned to a certain cottage and attended manual arts classes. He testified that on October 26, 1956, at about 6:30 p.m., he had an argument with one of the other boys in the basement of the cottage. Other boys were present, having gone there for a smoke. The argument was loud, but no blows were struck. Mr. Coleman, the supervisor of the cottage, came down to the basement, ordered claimant into the back room, directed him to take everything out of his back pockets, to put his hands against the wall, and then hit him in the seat with a paddle about five times. Mr. Coleman is 5 feet 11 inches in height and weighs 163 pounds; claimant was 5 feet 5 inches and lighter than his present weight of 130 pounds. Claimant asked Coleman to stop hitting him, whereupon, he testified, Coleman struck him “quite a few ” times with open hands or his fists on the right side of his head and the stomach. Claimant was hurt, but was not knocked down, and did not strike back at Coleman. During this time, Coleman and claimant were alone in the back room. Coleman then allowed claim *359 ant to rejoin the other boys, at which time his ear and the back of his head were swollen and hurt him. Claimant maintains that he had seen Coleman strike other boys on other occasions, as part of his disciplinary procedure, and that Coleman had struck him on prior occasions. Claimant had complained on these other occasions to the night supervisor and to the house father, Mr, Eomasser. On the night in question, claimant later went upstairs to sleep, but was unable to do so because his right ear hurt him and there was buzzing and ringing in it. He complained to the night supervisor of the pain in his ear, but did not recall having told him that Coleman had struck him. The night supervisor did nothing for him that night, and the next morning claimant proceeded to school. The ear was draining while he was there, and the teacher told him to see the nurse, who sent him to the hospital at the school. About a week later, his ear was swollen and infected and there was a “ bloody drainage ”, whereupon the claimant returned to the hospital. He was confined to the hospital for about three months. Drops were put in his ear daily and he was given injections. He told the doctor that the trouble he was experiencing followed his being struck in the head by Coleman. The treatment he received at the hospital seemed to do him no good and he suffered pain during his stay there. He said he had had no trouble with his ear before the incident in question. At one time during his hospital stay, he was sent to an outside hospital for X rays of his ear and head, and then he was returned to the school hospital. In September, 1957, he went home and saw his family physician who referred him to an ear specialist, Dr. Haber. The latter ordered drops and certain prescriptions for his ear. For a period of eight days, his mother, a hospital employee, put the drops in his ear and cleaned it. Then he returned to Industry. After having been discharged from the school hospital, and after his visit home, he returned to and lived there for three months, continuing to receive treatment from the hospital doctor and nurse by way of the cleaning of the ear during drainage. In all, claimant was at the school for 13 months, being released in 1957, at which time he was still having pain and drainage was still occurring. After his return home, his mother gave him medication consisting of drops in his ear, and cleaning the ear and administration of nose spray. He heard better in the left ear than the right, and cold weather affected his right ear, producing drainage. His mother’s medication lasted for about a year. He has been unable to go swimming since the incident, and must take care when showering not to allow water to enter the ear.
*360 On cross-examination, claimant stated that he saw Dr. Haber, the family physician, on two occasions, once while he was still in the hospital and the other the week before the trial. Between 1957 and 1960 he did not see the doctor. On the question of other beatings administered to him by Coleman, he testified that they had occurred on many occasions before the alleged ear injury during a two-week period, by the use of a paddle. Although these incidents were not reported by him, he claims conversation relating thereto was overheard by the supervisor and the house father and that he made a report to Romasser about one week before. Romasser told him that “ that is the discipline in the cottage ”. The incident in question was reported by him to Mr. Romasser about a week after it took place, and to the night supervisor the day it took place. The paddle that was used by Coleman was about 2 feet long, 3 inches wide and % inch thick. Although the claimant stated the incident occurred on October 26, he testified it could have happened on the 22d or 23d.
There was introduced into evidence a statement dated December 21, 1956, 9:00 a.m., initialed at the bottom of page 1 “ J. M. B.”, and a statement on page 2 signed “ John Brown ” that claimant had read page 1 which he had initialed, and that the statement was true. In this statement it is alleged that on or about October 22, 1956, at about 5:30 p.m., Coleman took claimant into the boiler room in the cellar and struck him in the face and body with his hands; that when Coleman had finished, claimant’s ear hurt him; that on November 2, 1956, claimant reported to the school nurse and was hospitalized for an infected ear; that at no time did claimant tell anyone with authority about being slapped by Coleman; that he thought about reporting the incident to Mr. Costello, the Superintendent, but neglected to do so. On the trial, claimant testified that he told Dr. Bodamy, a doctor at the school hospital at the time of his second treatment, that he had been struck by Coleman, and stated that except for this omission, the statement was true.
Since claimant’s release from the school, he had been convicted of disorderly conduct in April, 1958, for which he received a suspended sentence, and on April, 1959, of being drunk and disorderly, for which he received a sentence of 30 days.
William M. Brown, the father of claimant, testified that he received a letter from his son to the effect that he was in the hospital. He went with his wife to the hospital the first visiting day in November, 1956, and first went tó see Mr. Romasser, the house father at claimant’s cottage. He then went to the hospital where his son told him Coleman had struck him, that he *361 reported it and that nothing was done except that the next day the nurse sent him to the hospital. When the father saw him, there was a swelling behind his ear. The father spoke to Mr. Costello, asking him to discharge the boy so that he could arrange private medical care for him. He said that at the time of the incident his son was about 4 feet 8 inches in height and weighed less than 100 pounds. The boy came home in 1957, about a year later, and was taken to a private physician, an ear specialist. He saw his son on several occasions when he was still in the hospital, even though not confined to bed, the boy complaining of pain in his ear.
The hospital record indicates that claimant was 5 feet 5 inches in height and weighed 117 pounds; that he was admitted on November 1, 1956, at which time there was a complaint of a painful right ear and drainage from the ear; that he was in the hospital from November 1, 1956 to November 29, 1956, for treatment of the ear condition; that he was readmitted on December 20, 1956, complaining of draining of the right ear, remaining under treatment until January 24, 1957; that there was a further admission to the hospital on February 14, 1957, at which time he complained of sore throat and that he remained in the hospital until February 19, when he was discharged. The report states that claimant had had no previous injuries or illnesses.
Dr. Norman Haber, an ear specialist, testified that he first saw claimant at his Buffalo office on September 4, 1957, at which time he complained of hearing impairment and buzzing in his right ear. He first conducted a tuning fork test, which indicated that there was a typical obstructive-type hearing impairment present; he then conducted an audiometric examination, finding a 13% hearing loss in the right ear. He found also that claimant had definite nasal congestion due to allergy. His diagnosis was that of chronic middle ear disease with perforated eardrum, and possible allergic rhinitis. He stated that the pain complained of by the claimant and the profuse bloody discharge from the right ear which continued as shown by the hospital record of November, 1956, were consistent with a traumatic perforation of the eardrum, as were the draining right ear and the presence of pus in the right ear canal shown by the hospital record of December 20,1956 to January 24,1957. The doctor next saw claimant on January 27, 1960, when there was still a central perforation and some moisture in the middle ear. An audiometic examination showed that the hearing loss-in the right ear was then 6% compared with the previous 13%. The witness testified that in his opinion, striking and cuffing *362 over the head, especially over the right ear, was the competent producing cause of the perforation of the right eardrum. The allergic nose of claimant might be a complicating factor in the life of the claimant so far as taking care of his ear condition is concerned. The witness stated that the chronic perforation of the eardrum is likely to be permanent, and that claimant should not swim in the future, must exercise caution while taking a bath, be careful of colds that might be contracted, would be limited in the type of work he could perform and and would be ineligible for military service. His bill for medical services was $50.
Claimant then rested.
The State moved to dismiss the claim upon the ground that no cause of action was proved against the State, its agents or employees and upon the ground that claimant failed to prove the State careless or negligent in employing Mr. Coleman. Decision on these motions was reserved.
Lowell T. Coleman, on behalf of the State, testified that somewhere between October 22 and October 26, 1956, when he was a supervisor at the State School at Industry, he was in the basement of the Ganayat Cottage where claimant was an inmate. He heard claimant tell another boy in the corner of the basement that the other boy’s mother was a whore. The witness was 6 or 8 feet away at the time and walked over, grabbed claimant by the shirt, pulled him off the bench and asked him why he was making such remarks. The boy told him to “ go to hell ”, whereupon he took claimant by the arm into the boiler room and paddled him twice across the buttocks with a piece of wood which was lying there. The piece of wood was 12 inches to 15 inches in length, about 2 inches to 2% inches wide and half an inch in depth. The boy said he was sorry and would stop using such names. At the time of the paddling, the witness caused claimant to place his hands against the wall. He denied that he struck claimant with his hand or fist. As of the trial date, Coleman was 27 years of age, 5 feet 11 inches in height and weighed 163 pounds. The witness testified that one night he saw claimant holding the side of his head and asked him if there was something wrong. Claimant replied that his ear hurt and that one Doc Funke had hit him in the ear; that he had been to the hospital that morning and was to return the next day. The witness could not recall whether this was before or after the date of the incident in question. Funke was a boys’ supervisor who relieved Coleman on his night off. Coleman became attached to the school in February, *363 1955 and started working in Ganayat Cottage on October 17, 1956. Since February, 1957, Coleman has been employed in a private capacity, having left the State’s employ voluntarily.
Coleman stated that occasionally when a boy became overbearing or got into trouble with other boys, he was paddled in order to maintain discipline. If this did not suffice, the boy might be confined in a certain cottage. He made no report of the incident with the claimant until December 20, 1956. Called to the office of the Superintendent, Mr. Costello, he was told by him that the State was being sued by claimant and asked by the Superintendent if he had struck claimant. He told Mr. Costello that he had not struck claimant but did paddle him. He put this into written form at Mr. Costello’s request. The Superintendent told him to throw away the paddle. About a week thereafter Coleman left the State’s employ, having received an offer which was more remunerative to him.
Robert L. Sullivan, Assistant Superintendent of the School, testified that he interviewed Coleman for the position of supervisor, investigated his background, obtained references and hired him because he met the institution’s standards. He knew of no complaints having been made against Coleman. He testified that in the “ Guide for Staff” which is furnished to all employees at the time of their appointment, there is an indication as to when an employee may use physical force. One of such circumstances would be where a boy’s behavior is likely to cause a group disturbance, in which case he may use limited, reasonable force.
Albert G. Romasser, house father at Ganayat Cottage, testified that at no time did claimant make a complaint to him that Coleman had beaten him. The witness said he may have told the claimant’s father, during the course of a conversation with him, that Coleman had been in the process of correcting his son when the boy had turned around and talked back to him.
Both sides having rested, the State renewed the motions previously made and moved for dismissal on the ground that claimant failed to prove any cause of action against the State. Decision thereon was reserved.
In outlining the circumstances under which physical force may be used, the ‘ ‘ Guide for Staff ’ ’ quotes section 246 of the Penal Law, which provides as follows:
“ To use or attempt, or offer to use, force or violence upon or towards the person of another is not unlawful in the following cases:
• # *
*364 ‘* 4. When committed by a parent or the authorized agent of any parent, or by any guardian, master, or teacher, in the exercise of a lawful authority to restrain or correct his child, ward, apprentice or scholar, and the force or violence used is reasonable in manner and moderate in degree.”
The guide also provides that in the event physical force has been used to restrain or correct a boy, the full circumstances must be reported in writing to the Superintendent within 24 hours. The witness admitted that Coleman made no report within the specified time, and not until December 20, 1956.
The court finds that the State was not negligent or careless in its employment of Coleman as a supervisor. Thorough investigation was made of his background and commendatory references were obtained from responsible sources. The school properly decided that claimant, who had been honorably discharged from the United States Army, possessed the qualifications which met with the standards required by the institution for the position of supervisor.
The question to be determined herein is whether Coleman was justified in using physical force upon claimant, and if so, whether the force used by him was commensurate with the provocation therefor under all of the circumstances.
There is a sharp discrepancy between claimant’s and State’s testimony as to the events which occurred and which culminated in the alleged assault, as well as the degree of force which was employed by Coleman. Claimant testified that he had been engaged in a loud argument with another boy, and that for this reason Coleman administered physical punishment to him; Coleman claimed that he heard claimant tell another boy that the latter’s mother was a whore and that when Coleman pulled claimant from the bench where he was sitting, claimant told him to “go to hell ’ ’. Claimant alleges that Coleman paddled him on the buttocks about five times and then struck him “ quite a few times ” on the right side of the head and stomach. . On the other hand, Coleman asserts that all he did was to paddle claimant across the buttocks twice with a piece of wood, and he denies that he struck claimant with his hand or fist.
In any event, since Coleman employed physical force of whatever degree, he was obliged under the rules of the institution to provide the Superintendent with a written report of the incident within 24 hours. This he failed to do. It was not until he had been called to the office of the Superintendent at a later date, in connection with the incident, that he made out a report.
*365 As bearing upon the degree of force used by Coleman, it is important to consider the time element involved from the date of the alleged assault to the onset of the ear trouble suffered by claimant. Obviously the ear condition could not have been induced by paddling on the buttocks. The boy had had no previous history of any ear disturbance, and it is worthy of note that the pain ensued so soon after the time of the alleged occurrence. Although Coleman testified that claimant told him he had been struck by another supervisor, no evidence whatever to that effect has been introduced, and the statement remains completely unsubstantiated.
If subdivision 4 of section 246 of the Penal Law be involved, the court observes that that section coincides with the general law as to assault, providing as it does that any force or violence used to restrain or correct a child must be “ reasonable in manner and moderate in degree ”.
An officer may not use any more force than is necessary under the circumstances to perform his duty. If there is an unjustified and unprovoked assault by a State officer, the State may be held liable in damages. (Huff v. State of New York, 271 App. Div. 1040.)
It has been held that no provocative act, conduct, insult or Avord, if unaccompanied by an overt act of hostility, Avill justify an assault, no matter how offensive or exasperating it may be. (McCombs v. Hegarty, 205 Misc. 937; Curtis v. Kozeluh, 50 N. Y. S. 2d 883.) Words alone, no matter how coarse and abusive, never justify physical assault (Matter of Levy v. World-Telegram, 255 App. Div. 237), although their use may be considered in mitigation of damages.
Upon all of the evidence, the court concludes that supervisor Coleman did strike claimant upon the head; that such assault was unjustified and that the force used by him upon claimant Avas not commensurate with the provocation; that the assault Avas made by Coleman upon claimant intentionally, knowingly and willingly; that at the time of the assault, Coleman was acting Avithin the scope of his employment and that the assault Avas the proximate cause of the personal injuries sustained by claimant.
The court awards to the infant claimant John M. Brown, for the personal injuries sustained by him, the sum of $3,500 and to his father William M. Brown, for medical expenses incurred by him, the sum of $85 making a total of $3,585.
All motions heretofore made by the State on which decision was reserved are hereby denied.
*366 This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.